UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- x
JEFFREY P. ORLAN, *et al.*,                            :
                                                       :
                           Plaintiffs,                 :
                                                       :           **OPINION & ORDER**
                     -against-                          :           10-CV-4093 (DLI) (JMA)
                                                       :
SPONGETECH DELIVERY SYSTEMS, INC.,                     :
SECURTIIES LITIGATION, *et al*.,                       :
                                                       :
                           Defendants.                 :
----------------------------------------------------------------- x
QUANG LE, *et al.*,                                    :
                                                       :
                           Plaintiffs,                 :
                                                       :
                     -against-                          :           10-CV-4104 (DLI) (JMA)
                                                       :
SPONGETECH DELIVERY SYSTEMS, INC.,                     :
SECURTIIES LITIGATION, *et al*.,                       :
                                                       :
                           Defendants.                 :
----------------------------------------------------------------- x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiffs are investors who purchased shares of Spongetech Delivery Systems, Inc. ("Spongetech"), a publicly traded company that sold soap-filled sponges. Plaintiffs filed the instant consolidated class action against Spongetech and various individuals and entities affiliated or involved with Spongetech.[1] (*See* Plaintiffs' Amended Consolidated Complaint ("Am. Compl."), Doc. Entry No. 46, *Le v. Spongetech Delivery Systems, Inc., Securities Litigation*, 10-CV-4104 (DLI) (JMA).) Plaintiffs allege several violations of federal securities laws and regulations arising out of an alleged "pump and dump" scheme. Defendant Jack H. Halperin, a former attorney for Spongetech, moves to dismiss the claims against him. (*See* Halperin Motion

---

1       As explained in Section IV, *infra*, these investor class action suits were originally filed in the Southern District of New York

to Dismiss ("Halperin Mot."), Doc. Entry No. 48.)   Defendant Frank Lazauskas also moves to dismiss the claims against him.   (*See* Lazauskas Motion to Dismiss ("Lazauskas Mot."), Doc. Entry No. 71.)   Plaintiffs opposed both motions.   (*See* Plaintiffs' Opposition to the Halperin Motion ("Pls' Halperin Opp."), Doc. Entry No. 59; Plaintiffs' Opposition to the Lazauskas Motion ("Pls' Lazauskas Opp."), Doc. Entry No. 85.)   The Court consolidated these motions.

For the reasons set forth below, Halperin's motion to dismiss the Third Claim, arising under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. ("Exchange Act"), and the rules promulgated thereunder, is granted without prejudice and with leave for plaintiffs to replead in accordance with this opinion.   Halperin's motion to dismiss the Sixth Claim, arising under Section 12(a) of the Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("Securities Act"), is granted with prejudice.   Lazauskas's motion to dismiss the First Claim, arising under Section 10(b) of the Exchange Act and the rules promulgated thereunder, is granted without prejudice and with leave for plaintiffs to replead.   Additionally, Lazauskas's motion to dismiss the Second Claim, arising under Section 20(a) of Exchange Act, is granted without prejudice and with leave for plaintiffs to replead.   Finally, Lazauskas's motion to dismiss the Seventh Claim, arising under Section 15 of the Securities Act, is denied.

## BACKGROUND[2]

### I.      The Parties

Spongetech was a publicly traded company that sold soap-filled sponges, among other cleaning products.   (Am. Compl. ¶ 8.)   Defendant Michael Metter ("Metter") served as Spongetech's Chief Executive Officer, President, and as a Director, and, based on his stock

---

2      The Court's discussion herein is limited to the claims filed against defendants Lazauskas and Halperin as they are the only two defendants who moved for dismissal of the Amended Complaint.

ownership, held approximately 26.81% of all available votes.  (*Id*. at ¶ 9.)  Defendant Steven

Moskowitz ("Moskowitz") served as Spongetech's Chief Operating Officer, Chief Financial

Officer, Principal Accounting Officer, Secretary, Treasurer, and, as a Director, and based on his

stock ownership, held approximately 26.70% of all available votes.  (*Id*. at ¶ 10.)  Defendant

Frank Lazauskas ("Lazauskas") served as one of Spongetech's non-employee Directors, and based

on his stock ownership, held approximately 13.86% of all available votes.  (*Id*. at ¶ 11.)

Collectively, defendants Metter, Moskowitz, and Lazauskas owned 67.37% of Spongetech.  (*Id*.

at ¶ 14.)

   In addition to his title as Director, defendant Lazauskas's involvement with Spongetech

can be discerned from documents submitted by the parties.[3]  An electronic filing with the S.E.C.

from 2005, electronically signed by Lazauskas, indicates that Lazauskas was a "majority

shareholder" of Spongetech and one of two members of Spongetech's audit committee.  (*See*

Amendment No. 1 to Form SB-2 Registration Statement Under the Securities Act of 1933, dated

May 6, 2005, attached as Ex. 1 to the Graifman Declaration ("Graifman Decl."), Doc. Entry No.

86.)  Further, in the initial prospectus, Spongetech declared that it issued Lazauskas 3,330,000

shares of common stock "as compensation for managing our day-to-day operations, introducing us

to business, sales, contractual and fundraising opportunities and evaluating potential acquisition

candidates on our behalf."  (Prospectus filed on April 12, 2005 with the S.E.C., Ex. 2, to the

Graifman Decl.; *see also* Form SB-2 Registration Statement, filed April 10, 2006 with the S.E.C.,

Ex. 3 to the Graifman Decl.)

---

3  In resolving a motion to dismiss, filed under Rule 12(b)(6), courts may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the S.E.C., and documents possessed by or known to the plaintiff upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Specifically, defendant Lazauskas has conceded that the court may consider S.E.C. filings.  (*See* Def. Mem. at 2 n.1.)

Another public filing states that:

> On July 16, 2008, the Company entered into a consulting agreement
> with Frank Lazauskas pursuant to which Mr. Lazauskas agreed to
> act as a consultant to the Company for a three-year term.   In
> consideration for his agreeing to act as a consultant, and in lieu of
> any compensation payable in cash for the three-year term, the
> Company agreed to issue an aggregate of 2,000,000 shares of Class
> B Stock to Mr. Lazauskas.

(Form 10KSB, filed on August 29, 2008 with the S.E.C., Ex. A. to the Affidavit of William M.

Regan ("Regan Aff."), Doc. Entry No 72.)   This filing also indicates that Lazauskas served as the

sole member of the audit committee.   (*Id*. at 19.)   On October 23, 2009, Lazauskas filed a form

with the S.E.C. indicating that he owned 93,672,877 shares, which was significantly more than

previously had been reported in public filings.   (*See* Form 3, filed on Oct. 23, 2009 with the

S.E.C., attached as Ex. 4 to the Graifman Aff.)

Defendant RM Enterprises International, Inc. ("RM Enterprises"), is an entity controlled

by defendants Metter, Moskowitz, and Lazauskas.   (Am. Compl. at ¶¶ 13, 15.)   Based on public

filings, Lazauskas held 6.94% of RM Enterprises' stock.   (Form SB-2 filed with the S.E.C., Ex. C

at 20, Regan Aff.)   RM Enterprises held 49.32% of Spongetech's common stock, for an overall

ownership interest of 16.90%.   (*Id*. at ¶¶ 13, 16.)   In public filings, Spongetech listed RM

Enterprises as a "majority shareholder."    (*Id*. at ¶ 13.)   When RM Enterprises' ownership share

is considered, defendants Metter, Moskowitz, and Lazauskas collectively controlled 84.27% of

Spongetech's available votes.   (*Id*. at ¶ 16.)   In public filings, Lazauskas is described as a

"control person," "beneficial owner," and "director" of RM Enterprises.   (*See* Ex. 1, Graifman

Decl.)

The Amended Complaint alleges that defendants Metter, Moskowitz, Lazauskas, and RM

Enterprises:

4

> (a) directly participated in the management of Spongetech;
>
> (b) [were] directly involved in the day-to-day operations of Spongetech at the highest levels;
>
> (c) [were] privy to confidential proprietary information concerning Spongetech, its business and operations;
>
> (d) [were] involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;
>
> (e) [were] aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning Spongetech; and
>
> (f) approved or ratified these statements in violation of the federal securities laws.

(Am. Compl. at ¶ 17.)

Defendant Jack H. Halperin ("Halperin") is an attorney who was retained by Spongetech during the period of June 12, 2009 through September 29, 2009. (*Id*. at ¶ 25.) During his tenure with Spongetech, Halperin issued ninety-two opinion letters. These letters permitted Spongetech to remove the restrictive legends from over 922 million shares of its stock, held by RM Enterprises and other related entities, to permit the sale of those shares to the public.

## II.   The Pump

Plaintiffs allege that, prior to 2007, Spongetech had relatively little business. (*Id*. at ¶ 41.) Beginning in April 2007, defendants Metter and Moskowitz painted a more promising picture through a series of press releases. (*Id*. at ¶ 42, 55.) The press releases referred to business orders and anticipated revenue from five customers: SA Trading, US Asia, Dubai, Fesco, and New Century. (*Id*. at ¶¶ 43 46-48, 51.) In actuality, none of these companies existed, as is discussed in detail below.

For example, on April 30, 2007, Spongetech issued a press release stating it had "signed a Letter of Intent (LOI) to sell 1,500,000 Car Wash and Car Wax sponges to exporter, SA Trading Group Corp. . . . an exporter of automotive products to South America."   (*Id*. at ¶ 46.)   The press release further stated that:   "Steven Moskowitz, Chief Financial Officer of SpongeTech Delivery Systems stated[:]   'This is an exciting time for our company.   We look forward to finalizing our agreement with SA Trading Group Corp and beginning our sales and distribution in South America.'"   (*Id*.)   Plaintiffs allege that, at the time Spongetech and Moskowitz issued this statement, neither the letter of intent nor SA Trading existed.   (*Id*.)

With respect to anticipated revenues, Spongetech issued a press release on April 15, 2009, claiming "record sales of over $13,000,000 for the third quarter ending February 28, 2009" and [f]or the nine-month period ended February 28, 2009, the company reported revenues of about $31,000,000."   (*Id*. at ¶ 51.)   In that press release, Metter stated that:

> We have just concluded a fantastic third quarter 2009, even though our country has been in a very difficult economic environment, the company continues to experience significant growth.   The company's success is attributed to strong sales of all of our products utilizing an expanding diverse marketing strategy.   We began making shipments to retail outlets and distributors across the United States and we anticipate finishing off the fiscal year very strong.

(*Id*.)   The Amended Complaint alleges that, at the time Spongetech and Metter issued this statement, Spongetech had little to no customer base.   (*Id*. at ¶ 52.)

Defendants Metter, Moskowitz, and Spongetech also issued press releases that understated the volume of Spongetech's outstanding shares and claimed Spongetech intended to reduce its outstanding shares.   (*Id*. at ¶¶ 44, 49-50, 53-54.)   For example, on July 29, 2009, Spongetech issued a press release stating that it was "taking action" to "reduce the number of common shares that the Company has authorized to 900,000,000" and to "lower its outstanding shares to

approximately 500,000,000." (*Id.* at ¶ 53.)  In that release, Metter stated:  "We are excited to be moving quickly to complete the process of reducing both our authorized and outstanding shares" and "[t]his significant reduction is an expression of both the progress that the Company and its innovative product lines have made to date." (*Id.*)  At the time that Spongetech and Metter issued the press release, Spongetech had more than 2.4 billion outstanding shares. (*Id.* at ¶ 54.) Moreover, rather than reducing its outstanding shares, Spongetech issued 150,000,000 new shares to RM Enterprises within days of the press release. (*Id.*)

The Amended Complaint also alleges that defendants Spongetech, Metter, and Moskowitz submitted numerous false statements to the Securities and Exchange Commission ("S.E.C."). (*Id.* at ¶¶ 57-59.)  The filings included much of the same false information contained in the press releases. (*Id.*)  On September 4, 2009, the S.E.C. issued a subpoena to Spongetech seeking customer contact information. (*Id.* at ¶ 61.)

## II.     **The Dump**

From 2007 to 2009, defendants Metter, Moskowitz, Spongetech, and RM Enterprises dumped approximately 2.5 billion unregistered shares of Spongetech stock on the market in unregistered transactions. (*Id.* at ¶ 76-77.)  Spongetech funneled the sale of its stock through RM Enterprises and other entities affiliated with Metter, Moskowitz, Spongetech, and RM Enterprises, such as Asset Management Enterprises, AIT Capital, and Wesley Equities. (*Id.* at ¶ 79.) Spongetech distributed approximately 300 million restricted shares through Asset Management Enterprises, AIT Capital, and Wesley Equities, in unrestricted transactions, and the remainder of the 2.5 billion shares through RM Enterprises. (*Id.* at ¶ 80.)  To sell these restricted shares, defendants Metter, Moskowitz, Spongetech, and RM Enterprises procured and relied upon attorney opinion letters that expressed approval for such sales. (*Id.* at ¶¶ 82-110.)

7

In 2007, defendants hired Defendant Joel Pensley, an attorney, to write attorney opinion letters requesting the removal of restrictive legends from Spongetech stock held by RM Enterprises to sell it to the public.   (*Id*. at ¶ 84.)   From March 15, 2007 to June 19, 2007, Pensley drafted four attorney opinion letters, each citing S.E.C. Staff Bulletin No. 4 as the basis for removing the restrict legends.[4]   (*Id*. at ¶ 85.)   As a result of issuing his opinion letters, RM Enterprises was able to sell 12,000,000 unregistered shares to the public.   (*Id*. at ¶ 89.)

From July 2007 through May 2009, defendant Moskowitz sent 216 attorney opinion letters, purportedly written by defendant Pensley, to Spongetech's transfer agent, Olde Monmouth. (*Id*. at ¶¶ 92-95.)   As a result, the transfer agent removed the restrictive legends of over one billion shares of Spongetech stock, thereby making that stock available for sale to the public.   (*Id*.) After speaking with a concerned broker, Olde Monmouth contacted Moskowitz regarding a discrepancy in the fonts used in the original four Pensley letters and some of the more recently submitted Pensley letters.   (*Id*. at ¶ 94.)   Moskowitz admitted that the recent letters were not authored by Pensley, but that Pensley had given Moskowitz permission to alter and reuse the original opinion letters.   (*Id*. at ¶ 95.)

In May 2009, Moskowitz submitted nine attorney opinion letters from Spongetech's new counsel, an attorney named David Bomart.[5]   (*Id*. at ¶¶ 96-97.)   Olde Monmouth's counsel expressed concerns to Moskowitz regarding the authenticity of the letters and Moskowitz arranged for a teleconference meeting between Olde Monmouth's counsel and Bomart.   (*Id*. at ¶ 99.)   On the day of the scheduled teleconference, Moskowitz informed Olde Monmouth that he had terminated Bomart.   (*Id*.)

---

4        The details of Pensley's involvement are not at issue in the instant motions.   The Court has included a limited discussion of his involvement for completeness of the narrative.   (Compl. at ¶¶ 84-91.)

5        David Bomart is a fictitious attorney who was created by Moskowitz in furtherance of the fraudulent scheme.

In June 2009, Spongetech retained a new transfer agent, Worldwide Stock, and a new attorney, defendant Halperin.  (*Id*. at ¶ 100.)  From early June 2009 to September 29, 2009, Halperin issued ninety-two opinion letters, which resulted in the removal of restrictive legends from over 922 million shares of Spongetech's stock held by RM Enterprises, Asset Management Enterprises, AIT Capital, and Wesley Equities.  (*Id*. at ¶¶ 101-10.)  In his letters, Halperin indicated that the stock holders complied with the safe harbor provided by Rule 144 of the Securities Act.  (*Id*. at ¶ 100.)  In each letter, Halperin indicated that the entities holding Spongetech shares could remove the restrictive legends because those entities had held the securities for six months or longer.  (*Id*. at ¶ 102.)  The Amended Complaint alleges that Halperin knew, or was reckless in not knowing that 98% of those shares had been held for less than six months.  (*Id*. at ¶ 103.)  For example, on occasion, Spongetech issued shares to RM Enterprises one day before RM Enterprises sought and received an opinion letter from Halperin, stating that RM Enterprises' sale of those shares would be in compliance with Rule 144 because RM Enterprises had held those shares for at least six months.   (*Id*. at ¶ 107.)

Additionally, Halperin issued nineteen letters after August 19, 2009, in which he indicated that the transfer agent could remove restrictive legends from the stock because the public had "adequate current information" about Spongetech when the transaction took place.  (*Id*.  at ¶ 108.)  At the time he authored those letters, Spongetech had not issued any financial statements since its last S.E.C. filing in April 2009.  (*Id*. at ¶ 109.)  Indeed, Spongetech had failed to file its annual report with the S.E.C. for the year ending May 31, 2009.  (*Id*.)

## III.    The Investigation

Investors began raising questions and, as the Amended Complaint alleges, defendants sought to conceal the fraud.  On September 1, 2009, RM Enterprises paid George Speranza

("Speranza"), a consultant, $10,000 and an additional $5,000 on September 10, 2009.   (*Id*. at ¶ 62.)   Speranza created virtual store fronts and internet websites for SA Trading, US Asia, Dubai, Fesco, and New Century.   (*Id*. at ¶¶ 62-63.)   Speranza registered the domain names of each fictitious entity with Domains By Proxy, Inc., a private registration service that prevents access to the personal identifying information of the registrant.   (*Id*. at ¶ 65.)   On September 22, 2009, Speranza paid DaVinci Virtual Office Solutions ("DaVinci") via gift cards to set up virtual offices for SA Trading, US Asia, Dubai, Fesco, New Century, and Multi Media Sales (another fictitious customer).   (*Id*. at ¶ 66.)   Speranza created a fictitious contact person for each company.   (*Id*. at ¶ 67.)   One day later, DaVinci terminated Speranza's account.   (*Id*. at ¶ 68.)   On September 25, 2009, Speranza contacted Regus, another virtual office provider, and set up virtual offices for the fictitious entities in the same manner.   (*Id*. at ¶ 69.)

On September 25, 2009, the S.E.C. requested that Spongetech immediately provide it with the contact information for its six largest customers.   (*Id*. at ¶ 70.)   Spongetech provided the S.E.C. with the fictitious customer entities and fictitious contact people for those companies set up by Speranza through Regus.   (*Id*. at ¶¶ 71-72.)   In October 2009, Spongetech provided the S.E.C. with copies of purchase orders, invoices, and bills of lading for purchases from its fictitious customers.   (*Id*. at ¶ 74.)

In addition to the S.E.C.'s investigation, reporters from the press began investigating statements contained in Spongetech's press releases, S.E.C. filings, and its flurry of stock market activity.   (*Id*. at ¶¶ 120-30.)   On October 5, 2009, the S.E.C. temporarily suspended the trade of Spongetech's stock.   (*Id*. at ¶ 131.)   Some shareholders continued to trade on the grey market. (*Id*. at ¶ 132.)

## IV.    Court Filings

In October 2009, several class action lawsuits were filed against Spongetech, RM Enterprises, Metter, Moskowitz, and Lazauskas in the U.S. District Court for the Southern District of New York ("Southern District of New York").   These initial cases were consolidated on May 5, 2010.   On May 3, 2010, the United States Attorney for the Eastern District of New York ("the government") filed a sealed complaint against Metter and Moskowitz, charging them with conspiracy to commit securities fraud and conspiracy to obstruct justice.   (*See United States v. Metter*, 06-CR-600.)   Ultimately, the government filed a superseding indictment against Metter, Moskowitz, Speranza, and others on October 14, 2010, charging them with conspiracy to commit securities fraud, conspiracy to obstruct justice, conspiracy to commit money laundering, and perjury.   (*See United States v. Metter*, 06-CR-600, Doc. Entry No. 38.)   No criminal charges were filed against Lazauskas or Halperin and the criminal case is pending.   On May 5, 2010, the S.E.C. filed a complaint in this Court against Spongetech, RM Enterprises, Moskowitz, Speranza, Pensley, Halperin, and Metter.   (*See S.E.C. v. Spongetech, et al.*, 10-CV-2031, Doc. Entry No. 1.) Currently, discovery is stayed in that case pending resolution of the criminal action.   On July 23, 2010, Spongetech filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York.   On September 1, 2010, the class actions were transferred to this Court as related to the S.E.C.'s action against Spongetech and its various officers and control persons, and to the criminal action against Metter, Moskowitz, and other individuals.   On October 13, 2010, the Court consolidated the class actions, designating Civil Docket Number 10-CV-4093 as the lead case.

**DISCUSSION**

I.      **Legal Standards**

    A.      **Motions to Dismiss**

    Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."   The pleading standard under Rule 8 does not require "detailed factual allegations," *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007), "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."   *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009).   A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"   *Id.* (*quoting Twombly*, 550 U.S. at 557).   A plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.   *Twombly*, 550 U.S. at 555.

    On a Rule 12(b)(6) motion, the court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party.   *Taylor v. Vt. Dep't of Educ.*, 313 F. 3d 768, 776 (2d Cir. 2002).   The court may only consider the pleading itself, documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, and matters of which judicial notice may be taken.   *See Chambers v. Time Warner, Inc.,* 282 F. 3d 147, 153 (2d Cir. 2002); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F. 3d 69, 72 (2d Cir. 1995).   As discussed in Note 3, *supra*, the court may also consider legally required public disclosure documents filed with the S.E.C.

### B.    Securities Fraud Pleadings

A complaint alleging securities fraud under Section 10(b) of the Exchange Act is subject to two heightened pleading standards.  First, the complaint must satisfy Rule 9(b) of the Federal Rules of Civil Procedure, which requires that the complaint "state with particularity the circumstances constituting the fraud."   Fed. R. Civ. P. 9(b); *see also ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F. 3d 87, 99 (2d Cir.).   Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

### C.    Section 10(b) Claims

Section 10(b) of the Exchange Act makes it illegal "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b).  Rule 10b-5, promulgated thereunder, makes it unlawful for "any person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."   17 C.F.R. § 240.10b-5.   To state a claim for relief under § 10(b) and Rule 10b-5, a plaintiff "must plead six elements:   (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."   *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 613 (S.D.N.Y. 2008).

### 1.      A Material Misrepresentation or Omission

A plaintiff may bring a claim under § 10(b) and Rule 10b-5 based on either affirmative misstatements or omissions of material facts.   "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."   *ATSI Commc'ns*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).   A claim based on omissions must allege that "the corporation is subject to a duty to disclose the omitted facts."   *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F. 3d 259, 267 (2d Cir. 1993)).

Additionally, the alleged misstatements or omissions must have been material.   "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."   *Ganino v. Citizens Utils. Co.*, 228 F. 3d 154, 161 (2d Cir. 2000). "Because materiality is a mixed question of law and fact, in the context of a Rule 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."   *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F. 3d 187, 197 (2d Cir. 2009) (internal quotation marks omitted).

### 2.      Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."   *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F. 3d 98, 108 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007)) (internal quotation marks omitted).   A plaintiff

14

may establish an inference of scienter in a claim filed under Section 10(b) or Rule 10b-5 by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns*, 493 F. 3d at 99.   To allege "motive and opportunity" to defraud, a complaint must allege facts showing that the defendants "benefitted in some concrete and personal way from the purported fraud."   *Novak*, 216 F. 3d at 307-08.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."   *Kalnit v. Eichler*, 264 F. 3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).   "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior."   *Novak*, 216 F. 3d at 308.   "Strong circumstantial evidence of reckless conduct also gives rise to an inference of scienter, so long as the complaint alleges 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"   *In re General Electric Co. Sec. Litig.*, ___ F. Supp. 2d ___, 2012 WL 90191, *25 (S.D.N.Y. Jan. 11, 2012) (quoting *Kalnit*, 264 F.3d at 142).   "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."   *Kalnit*, 264 F.3d at 142 (citations omitted).

Under the heightened pleading requirements of the PLSRA, plaintiffs must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2)(A).   In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court instructed courts to engage in a three-step analysis when evaluating scienter:

> *First* . . ., courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true . . . .   *Second*, courts must consider the complaint in its entirety, as well as sources courts ordinarily examine when ruling on a Rule 12(b)(6) motion to dismiss . . . .   The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard . . . .   *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences . . . .   The strength of an inference cannot be decided in a vacuum.   The inquiry is inherently comparative:   How likely is it that one conclusion, as compared with others, follows from the underlying facts?

*Tellabs*, 551 U.S. at 322-23 (emphases in original).

## II.      Lazauskas's Motion to Dismiss

The Amended Complaint asserts that defendant Lazauskas violated:   (1) Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, (2) Section 20(a) of the Exchange Act, and (3) Section 15 of the Securities Act.   Lazauskas moves to dismiss each of these claims.

### A.      Lazauskas's Challenge to the Section 10(b) Claim

Lazauskas assails the Section 10(b) claim on the grounds that it fails (1) to attribute any specific misstatement or omission to him, and (2) to establish scienter.   For the reasons set forth below, the Court grants Lazauskas's motion to dismiss, without prejudice, and grants plaintiffs leave to amend the Section 10(b) claim asserted against Lazauskas.

In the Amended Complaint, plaintiffs provide several examples of allegedly fraudulent press releases and public filings signed or authored by defendants Metter and Moskowitz.   There are no similar statements or filings associated specifically with Lazauskas.   Plaintiffs do, however, repeatedly group Lazauskas with defendants Metter and Moskowitz under the title "Individual Defendants" in connection with various allegations.   It is clear that the Amended

Complaint, in its current form, relies on the group pleading doctrine to establish that Lazauskas made misstatements or omissions.

The group pleading doctrine allows a plaintiff to rely on "a presumption that statements in . . . press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *Pension Committee of University of Montreal Pension Plan v. Bank of Am. Secs. LLC*, 446 F. Supp. 2d 163, 180 (S.D.N.Y. 2006). However, this doctrine is "extremely limited in scope, applying only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions." *Id*. "The doctrine may apply to outside directors, who although almost by definition [are] excluded from the day-to-day management of a corporation, can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, . . . have access to information more akin to a corporate insider." *Id*. "But a bare allegation that a defendant has inside information, in the absence of any allegation to support a reasonable inference that the defendant had control over the content of the allegedly fraudulent statement, is not sufficient." *Id*.

It is uncertain whether plaintiffs may rely on the group pleading doctrine under the circumstances of this case. At the time of briefing, several circuits had held that the group pleading doctrine did not survive enactment of the PLSRA. *See, e.g.*, *Winer Family Trust v. Queen*, 503 F. 3d 319, 335-36 (3d Cir. 2007) (holding that "the group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA"). The Second Circuit had not addressed the issue; but several district judges in this circuit that had done so held that the group pleading doctrine survived enactment of the PLSRA. *See, e.g.*, *In Re BISYS Secs. Litig.*, 397 F. Supp. 2d 430, 439 n.42 (S.D.N.Y. 2005) (listing district court cases in this circuit and

17

elsewhere that held the group pleading doctrine survived the PLRSA).   Thus, the group pleading doctrine remained in effect in this circuit at the time plaintiffs' commenced this suit and the parties briefed these motions.

However, a recent Supreme Court decision casts doubt on the viability of the group pleading doctrine.   In *Janus Capital Group, Inc. v. First Derivative Traders*, the Supreme Court concluded that a mutual fund investment adviser could not be held liable in a private securities action filed under Rule 10b-5 for false statements contained in its client's mutual fund prospectuses, even though the investment adviser was involved in preparing (though not signing) the prospectuses.   *See Janus Capital Group, Inc. v. First Derivative Traders*, ___ U.S. ___, 131 S. Ct. 2296, 2302-05 (2011).   In reaching its conclusion, the Court analyzed the terms contained in Rule 10b-5 as defined in various dictionaries and explained that "one 'makes' a statement by stating it."   *Id*. at 2302.   The Court adopted a new rule, announcing that "the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it."   *Id*. at 2303.

While the group pleading doctrine apparently was "alive and well" in this circuit prior to *Janus*, it is uncertain whether it survived *Janus*.   *See Rolin v. Spartan Mullen Et Cie, S.A.*, 2011 WL 5920931, *5-6 (S.D.N.Y. Nov. 23, 2011) (dismissing plaintiff's Rule 10b-5 claims because even if the group pleading doctrine survived *Janus*, plaintiff failed to meet the requirements for group pleading).   Accordingly, Lazauskas's motion to dismiss the Section 10/Rule 10b-5 claim is granted, without prejudice, and with leave for plaintiffs to amend their complaint in conformity with this change to the legal landscape.   In particular, plaintiffs should include any statements directly attributable to Lazauskas such as statements contained in public filings signed by Lazauskas.   Notably, the Court rejects Lazauskas's contention that he was merely an outside

18

director, as the submissions indicate a far greater level of involvement.   (*See* Am. Compl. ¶¶ 13, 15-17; Graifman Decl., Exs. 1, 3-4; Regan Aff., Ex. A.)

Additionally, plaintiffs should amend their pleadings against Lazauskas to plead scienter with specificity.   Whether or not the group pleading doctrine survived *Janus*, that doctrine is irrelevant to the pleading of scienter.   It is well-settled that:

> [T]he group pleading doctrine has no effect on the PSLRA's *scienter* requirement.   It merely gives plaintiffs the benefit of a presumption that certain kinds of statements were made by certain kinds of defendants.   It does not permit plaintiffs to presume the state of mind of those defendants at the time the alleged misstatements were made.

*E.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d at 439-40 (emphasis in original).

### B.      Lazauskas's Challenge to the Section 20(a) Claim

Under Section 20(a) of the Exchange Act:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or causes of action.

15 U.S.C. § 78(t).   "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."   *ATSI Commc'ns*, 493 F. 3d at 108.   "In this Circuit, the 'control person' provisions are broadly construed as they 'were meant to expand the scope of liability under the securities laws.'"   *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) (citation omitted.)

Lazauskas does not dispute the first element—that Spongetech violated Section 10(b). The second element—control—"has been construed as requiring 'only some indirect means of discipline or influence short of actual direction' by the purported controller." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 517 (S.D.N.Y. 2009).   Control of a primary violator may be demonstrated by "showing that the defendant 'possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 455-56 (S.D.N.Y. 2009) (citing *S.E.C. v. First Jersey Secs., Inc.*, 101 F. 3d 1450, 1473 (2d Cir. 1996)). "[O]nly the ability to direct the actions of the controlled person, and not the active exercise thereof is necessary to establish control." *Dietrich*, 126 F. Supp. 2d at 764 (citations omitted).

Courts in this circuit have held that director status alone is not sufficient to establish control. *See, e.g.*, *Mandell v. Reeve*, 2011 WL 4585248, *8 (S.D.N.Y. Oct. 4, 2011) (discussing control person liability as it relates to officers and directors).   However, the pleadings in this case indicate that Lazauskas, a shareholder at Spongetech and RM Enterprises, was far more involved with Spongetech and its day-to-day management and operations than a mere outside director. (*See* Am. Compl. ¶¶ 13, 15-17; Graifman Decl., Exs. 1, 3-4; Regan Aff., Ex. A.)   Indeed, Spongetech issued Lazauskas 3,330,000 shares of common stock "as compensation for managing our day-to-day operations, introducing us to business, sales, contractual and fundraising opportunities and evaluating potential acquisition candidates on our behalf."   (Graifman Decl., Ex. 2; *see also* Graifman Decl., Ex. 3.)   Further, in 2008, Lazauskas agreed to serve as a consultant for Spongetech, in exchange for an additional 2,000,000 shares of Spongetech stock. (Regan Aff., Ex. A.)   Under these circumstances, the Court cannot, as a matter of law, conclude that plaintiffs failed to establish that Lazauskas controlled Spongetech.

Lazauskas contends, in a cursory manner, that plaintiffs failed to establish the third element of their Section 20(a) claim—that Lazauskas was a culpable participant in Spongetech's fraud. While the submissions indicate otherwise, as plaintiffs again appear to rely on a group pleading theory and for the reasons set forth in Section II.A., *supra*, plaintiffs must plead this claim against Lazauskas with more specificity.   As such, Lazauskas's motion to dismiss is granted but plaintiffs are granted leave to replead the Section 20(a) claim with more specificity.

## C.    Lazauskas's Challenge to the Section 15 Claim

Section 15 of the Securities Act extends liability to "[e]every person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under [Sections 11 or 12]." 15 U.S.C. § 77o.   To establish control person liability under Section 15 at the pleadings stage, "a plaintiff must plead:   (1) a primary violation; and (2) control over the primary violator."   *In re CIT Group Inc. Secs. Litig.*, 2010 WL 2365846, *8 (S.D.N.Y. Jun. 10, 2010).   As set forth above, the Amended Complaint adequately pleaded Spongetech's violations of securities law and Lazauskas's status as a control person.   Moreover, contrary to Lazauskas's contention, it is unsettled whether plaintiffs are required to plead culpable participation in connection with a Section 15 claim.   *See Plumbers' & Pipfitters' Local # 562 Supp. Plan & Trust v. J.P. Morgan Acceptance Corp. I.*, 2011 WL 6182121, *20-21 (E.D.N.Y. Dec. 13, 2011) ("The defendants argue that the same culpable participant defense available to causes of action arising under Section 20(a) is also applicable to those arising under Section 15.   This is an open question.") (citing *In re Lehman Bros. Mortgage-Backed Secs. Litig.*, 650 F. 3d 167, 186 (2d Cir. 2011)).   Accordingly, Lazauskas's motion to dismiss plaintiffs' Section 15 claim is denied.

III.     **Halperin's Motion to Dismiss**

A.      **Plaintiffs' Claim under Section 10(b) and Rule 10b-5**

Defendant Halperin asserts that the plaintiffs' Section 10(b)/Rule 10b-5 claim must be dismissed as plaintiffs failed to allege (1) materiality, (2) scienter, and (3) loss causation.   The statements at issue in the instant motion are the statements contained in defendant Halperin's attorney opinion letters, and not the press statements and public filings authored by Spongetech, Metter, and Moskowitz.

1.      **Materiality**

Defendant Halperin correctly notes that the Amended Complaint does not contain any allegations as to the materiality of the statements contained in defendant Halperin's attorney opinion letters.   (*See* Am. Compl. ¶¶ 169-178.)   Plaintiffs cannot remedy the insufficiency of the Amended Complaint on this issue by making such assertions in their opposition papers.  *See Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (explaining that it is improper for courts to consider "factual allegations contained in legal briefs or memoranda" when resolving motions to dismiss).   To satisfy this element, plaintiffs must plead that a reasonable investor, "in making investment decisions," "would have considered significant" the false statements contained in defendant Halperin's attorney opinion letters.   Defendant Halperin's motion to dismiss plaintiffs' claim arising under Section 10(b)/Rule 10b-5 is granted without prejudice and with leave for plaintiffs to replead this claim in accordance with this opinion.

2.      **Scienter**

Defendant Halperin also contends that plaintiffs cannot establish scienter by any means. As a preliminary matter, there are no allegations that defendant Halperin engaged in intentionally unlawful conduct.   Nor do plaintiffs dispute this point in their opposition brief.   Accordingly, the

22

Court holds that the Amended Complaint fails to adequately plead intentional wrong doing by defendant Halperin.

Defendant Halperin contends that the plaintiffs are unable to establish scienter as there are no allegations of motive and opportunity.   There are no allegations in the Amended Complaint that Halperin received shares of Spongetech stock in exchange for his services or that he sold any shares of Spongetech stock.   Further, there are no allegations that he received any payments other than his standard hourly rate for work performed.   Plaintiffs assert that Halperin's motive is evidenced in his admission before the S.E.C. that Spongetech was a "substantial client." However, as courts have noted in the context of common law fraud claims, "alleging that a professional performed services for other defendants," without more, "is insufficient for inferring scienter."   *Morlin v. Trupin*, 711 F. Supp. 97, 110 (S.D.N.Y. 1989); *see also Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("To accept generalized allegation of motive based on a desire to continue to obtain management fees would read the scienter requirement out of the statute.").   Further, Spongetech was just one of Halperin's clients during the period at issue and motive cannot be inferred under these circumstances.   *Cf. S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1242 (S.D.N.Y. 1992) ("It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees.").

Yet, contrary to Halperin's assertions, allegations of motive are not necessary to establish scienter.   *See Tellabs*, 551 U.S. at 325 ("While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference . . . the absence of a motive allegation is not fatal.").   Further, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."   *Id.* at 326 (announcing the

23

pleading standards for scienter as required under the PLSRA, but declining to resolve whether plaintiffs satisfied these requirements).   Accordingly, in evaluating whether plaintiffs have satisfied this element, the Court must review the Amended Complaint as a whole and not each allegation or lack thereof in isolation.   At the same time, it is important to note that, "[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."   *Kalnit*, 264 F. 3d at 142.

The crux of the issue before this Court is whether defendant Halperin acted recklessly in writing his attorney opinion letters.   "Conscious recklessness is a 'state of mind approximating actual intent, and not merely a heightened form of negligence.'"   *Saltz v. First Frontier, L.P.*, 782 F. Supp. 2d 61, 71 (S.D.N.Y. 2010) (quoting *S. Cherry St.*, 573 F. 3d at 109).   Recklessness is "at the least, . . . an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."   *Novak*, 216 F. 3d at 308.   An inference of recklessness "may arise where the complaint sufficiently alleges that the defendants . . . knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor."   *Id*. at 311.

The Amended Complaint discusses several of Halperin's opinion letters in depth and specifies which statements contained in the letters were false.   In their opposition brief, plaintiffs assert that the statements contained in Halperin's letters were contradicted by his S.E.C. testimony and other documentary evidence available at the time he issued his letters.   However, the Amended Complaint does not contain these allegations and, even if they were included, plaintiffs must set forth those allegations in the complaint with greater specificity.   "Where plaintiffs

24

contend that defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F. 3d at 309.   Plaintiffs have failed to do so here.   Accordingly, Halperin's motion to dismiss is granted, without prejudice, and plaintiffs are granted leave to replead scienter with greater specificity.[6]   Plaintiffs should identify the false statements contained in Halperin's letters, identify documents or other evidence available to Halperin at the time he issued the particular false opinion letter and how that discrepancy establishes scienter.

### 3.   Loss Causation

"A securities fraud plaintiff is required to 'prove both transaction causation (also known as reliance) and loss causation.'"   *Wilamowsky v. Take-Two Interactive Software, Inc.*, ___ F. Supp. 2d ___, 2011 WL 4542754, at *5 (S.D.N.Y. Sept. 30, 2011) (quoting *ATSI Commc'ns*, 493 F. 3d at 106)).   "Transaction causation only requires allegations that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'"   *ATSI Commc'ns*, 493 F.3d at 106 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F. 3d 161,172 (2d Cir. 2005)).   "Loss causation, by contrast, is the proximate causal link between the alleged misconduct and the plaintiff's economic harm."   *Id*. (citing *Dura Pharm.*, 544 U.S. at 346).   "To that end, the plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."   *Id*. at 107.

---

6        It would be helpful if the revised complaint pairs Halperin's letters with conflicting statements that were publicly available at the time he drafted the particular letters in a section outlining his involvement.   For example, the Amended Complaint indicates that Spongetech issued a press release on July 29, 2009 stating that it was "taking action" to "reduce the number of common shares that the Company has authorized to 900,000,000" and to lower its outstanding shares to approximately 500,000,000" shares.   (Compl. at ¶ 53.)   There is no mention of this press release in the discussion of Halperin's contemporaneous letters, which authorized the sale of approximately 922 million shares.   Rather than expecting the Court to cross reference the allegations, the revised complaint should pair the contrasting statements.

The Amended Complaint adequately pleads transactional causation.  (Am. Compl. ¶¶ 174-75.)   The Amended Complaint also adequately pleads loss causation with respect to fraudulent statements made by defendants Metter and Moskowitz; however, the Amended Complaint fails to adequately plead loss causation against defendant Halperin regarding the false statements contained in his attorney opinion letters.   Accordingly, defendant Halperin's motion to dismiss is granted without prejudice and plaintiffs are granted leave to replead loss causation.

**B.      Plaintiffs' Claim under Section 12(a)**

Section 12(a)(1) of the Securities Act establishes civil liability for breach of Section 5 of the Securities Act, *see* 15 U.S.C. § 77l, which prohibits the use of the mails or means of interstate commerce to offer or sell a security unless it is registered with the Commission or is exempt from registration.  *See* 15 U.S.C. § 77e.   To establish a prima facie case of a violation of Section 5, a plaintiff must demonstrate "(1) that the defendant directly or indirectly sold or offered to sell securities; (2) that no registration statement was in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale."   *Cobalt Multifamily Investors I, LLC v. Arden*, ___ F. Supp. 2d ___, 2011 WL 4542734, *6 (S.D.N.Y. Sept. 30, 2011) (quoting *S.E.C. v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007)).   Section 12 addresses seller liability.   There are no allegations that defendant Halperin sold or offered to sell Spongetech's stock to plaintiffs or to any other individuals.   Accordingly, plaintiffs' Section 12(a)(1) claim is dismissed with prejudice.

**CONCLUSION**

For the reasons set forth above, Halperin's motion to dismiss the Third Claim, arising under Section 10(b) of the Exchange Act and the rules promulgated thereunder, is granted without prejudice and with leave for plaintiffs to replead in accordance with this opinion.   Halperin's motion to dismiss the Sixth Claim, arising under Section 12(a) of the Securities Act is granted with prejudice.   Lazauskas's motion to dismiss the First Claim, arising under Section 10(b) of the Exchange Act and the rules promulgated thereunder, is granted without prejudice and with leave for plaintiffs to replead.   Additionally, Lazauskas's motion to dismiss the Second Claim, arising under Section 20(a) of Exchange Act, is granted without prejudice and with leave for plaintiffs to replead.   Finally, Lazauskas's motion to dismiss the Seventh Claim, arising under Section 15 of the Securities Act, is denied.   Plaintiffs are granted leave to file an amended complaint on or before April 30, 2012.

SO ORDERED.

DATED:       Brooklyn, New York
             March 29, 2012

_____/s/_____
                          DORA L. IRIZARRY
                          United States District Judge